UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

MATTER OF                                          CASE NUMBER: 04-13648

CHRIS LEVERT SANFORD                               CHAPTER 13

## MEMORANDUM OPINION

Debtor Chris Levert Sanford ("Sanford") filed a voluntary chapter 7 petition on November 2, 2004.  On debtor's motion, the case later was converted to a chapter 13 proceeding.  Sanford filed his initial chapter 13 plan on December 2, 2004.  After that plan drew several objections, Sanford filed a First Amended Plan and a Second Amended Plan to resolve creditor's objections.

Guaranty Bank ("Guaranty") objects to debtor's second amended chapter 13 plan on several grounds.  It argues among other points that:

1)   the debtor's total unsecured debt exceeds the limits set forth in 11 U.S.C. §109, and that as a result Sanford is not eligible for chapter 13 relief;

2)   the debtor's plan fails to pay the value of Guaranty's secured claim;

3)   under the debtor's plan, unsecured creditors will not receive as much as they would in a chapter 7 liquidation;

4)   neither the bankruptcy petition nor the plan was filed in "good faith"; and

5)   the plan is not feasible.

The evidence established that Sanford filed neither his petition nor his plans in good faith, and that the plan is not feasible.  For reasons set out in this opinion, the court declines to confirm Sanford's plan, and will convert the case to a chapter 7 liquidation.

## FACTS

For several years before his 2004 bankruptcy filing, Chris Sanford made a living managing and trading cattle.[1]  The debtor did not keep accurate records of all his cattle transactions, and claims that before bankruptcy he sold most of his herd, or else lost it to disease.[2]

After (or perhaps in addition) to trying his hand in the cattle business, Sanford embarked on a plan to develop real estate in late 2003.  He and Wade McCants allegedly formed C&W Development, L.L.C. then to acquire land from Sanford's father, Chapman Sanford.  Because McCants and the debtor did not have enough money to buy the land outright, they convinced the debtor's father to give their limited liability company an option to purchase the property.[3]  In lieu of a cash deposit on the option, the debtor began clearing the property.  Sanford testified that his father agreed to treat the work as a deposit if the "deal did not come through."  The debtor ultimately did not succeed in "pulling a deal together" to develop the land, and the debtor claimed that the purchase option expired after Chapman Sanford gave the debtor several extensions of the time to exercise it.  Chapman Sanford did not testify at the hearing.

Sanford was to purchase the land with the backing of investors when C&W completed the development.  When a real estate contract could not be put together and the investors pulled out of the project, Sanford filed bankruptcy.

---

[1]  Transcript of March 4, 2005 Examination of Christopher Sanford, page 31 (Guaranty Bank Exhibit G).

[2]  Transcript of March 4, 2005 Examination of Christopher Sanford, page 32 (Guaranty Bank Exhibit G).

[3]  September 2, 2003 Option to Purchase (Debtor's Exhibit 1).  The evidence does not reflect whether the limited liability company ever was formed.

Guaranty filed a proof of claim for $252,783.59.[4]  Guaranty alleges that $19,850.00 of its claim is secured by Sanford's livestock and farm equipment, and that $37,000.00 is secured by a third mortgage on the debtor's house.  It concedes that the remaining $195,933.59 is unsecured.

## ANALYSIS

### Eligibility for Chapter 13 Relief

To be eligible for chapter 13 an individual debtor must not have more than $307,675.00 in noncontingent, liquidated, unsecured debt.  11 U.S.C. §109(e).  To assess a debtor's eligibility for chapter 13 relief, bankruptcy courts must determine the amount of debt for which a debtor is liable on the date the original petition is filed.  11 U.S.C. §109(e); *Scovis v. Henrichson (In re Scovis)*, 249 F.3d 975 (9th Cir. 2001).  Generally, courts will merely look to the debtor's original schedules to make this determination unless there is evidence of bad faith, in which case the court will look beyond the schedules to determine the amount of claims against a debtor.  *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751 (6th Cir. 1985).  *Accord, Scovis v. Henrichson (In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001).

The schedules accompanying Sanford's chapter 7 petition listed several unsecured debts totaling $299,505.19, slightly below the statutory limit.[5]  Moreover, the proofs of claims filed by creditors reflect that the debtor's total noncontingent, liquidated,

---

[4]  Proof of Claim filed by Guaranty Bank & Trust Co. (Guaranty Bank Exhibit Q).

[5]  In a case converted to chapter 13 from chapter 7, courts generally consider the list of debts accompanying the original chapter 7 petition to determine eligibility.  *In re Rohl*, 298 B.R. (Bankr. E.D. Mich. 2003); *In re Grew*, 278 B.R. 619 (Bankr. M.D. Fla. 2002).

unsecured debt is only $256,042.14, which is significantly under the limit set forth in 11 U.S.C. §109(e).

Accordingly, Sanford is eligible for chapter 13 relief based on the amount of his unsecured debt.

### Payment of Guaranty's Secured Claim

Guaranty claims that Sanford's chapter 13 plan does not adequately provide for its secured claim. A review of the debtor's second amended plan shows that this is simply not true.

Guaranty filed a proof of claim for $252,783.59.[6] Of this, $19,850.00 is secured by livestock and farming equipment. The second amended plan appropriately reflects this amount and provides for it. The $232,933.59 claim balance is secured only by a third mortgage on Sanford's house. Guaranty stipulated in its proof of claim that a large portion of this balance is unsecured, because there is little equity in the house after taking into account the amounts owed on superior mortgages. The second amended plan provides that the debtor intends to avoid the remaining lien through an adversary proceeding under Bankruptcy Rule 7001. The proposed treatment of Guaranty's claim is permitted by 11 U.S.C. §1322(b).

### Best Interest of Creditors

A court may confirm a chapter 13 plan only if the value of the property to be distributed to each unsecured creditor is greater than the value it would receive if the estate were liquidated under chapter 7. 11 U.S.C. §1325(a)(4). According to both the trustee's Pre-Confirmation Status Report and Sanford's second amended plan, a

---

[6] Proof of Claim filed by Guaranty Bank & Trust Co. (Guaranty Bank Exhibit Q).

liquidation of the estate would yield no value for creditors holding non-priority unsecured claims after the debtor's tax obligations are satisfied.

Sanford's plan proposes to pay the class of allowed unsecured claims $1380.00 for each of the first two months, and then $847.93 monthly for the remaining fifty seven months of the plan. This plan does provide for unsecured creditors to receive more value than they would if the estate were liquidated in chapter 7. Thus, Sanford's plan satisfies the best interest of creditors test.

### Good Faith

Guaranty also objects to Sanford's plan on the grounds that neither the petition nor the plan were filed in good faith. 11 U.S.C. §1325. Congress did not define *good faith* in the Bankruptcy Code. Determining whether a debtor has prosecuted his chapter 13 case in good faith requires a case by case review of the facts, taking into account the totality of the circumstances surrounding a case. *Public Finance Corporation v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983). More recently, in *Matter of Chaffin*, 816 F.2d 1070 (5th Cir. 1987), the court of appeals reminded bankruptcy courts that the *Freeman* test requires an examination of all the facts to determine whether a chapter 13 debtor is in good faith.

The record contains evidence of several factors that betray Sanford's bad faith. They include the circumstances surrounding the filing of the original petition; Sanford's indifference to the many obligations of a chapter 13 debtor; and his dealings during the case with insiders, including his mother and father. In combination, the evidence supports the conclusion that Sanford lacked good faith in filing and prosecuting his chapter 13 case.

### Irregularities in Commencement of the Case

At the confirmation hearing, Sanford testified that he was incarcerated on the day his original chapter 7 petition was filed.[7]  Sanford testified that his brother's law partner, Marta Richards, prepared and signed his name to a chapter 7 petition filed in an effort to stay legal proceedings and obtained his release from jail.[8]

The chapter 7 petition contained no indication that Ms. Richards signed it in a representative capacity.  The fact that she signed the petition – and that the debtor had never signed it — only came to light at the confirmation hearing.  During that hearing, debtor's current counsel essentially invited the court to dismiss the case because of this defect, although Sanford had enjoyed the benefit of the automatic stay and his case had consumed a significant amount of judicial resources.

Although the debtor's failure to sign the original petition was cured by the subsequent motion to convert the case to a chapter 13 proceeding (which Sanford himself did sign), the evidence supports the inference that the debtor's original petition was filed as an act of gamesmanship, and solely to take advantage of the protection provided by the automatic stay to try to obtain his release from jail.

### Indifference to Chapter 13 Debtor's Obligations

Sanford's indifference to his obligations as a chapter 13 debtor also betrays his lack of good faith.  For example, the debtor disobeyed a court order to appear for a

---

[7]  As explained in the court's January 31, 2005 memorandum opinion, the debtor had been arrested for refusing to surrender a leased bulldozer to an equipment lessor.

[8]  All information on the original petition was handwritten.  Ms. Richards signed her name in the space for debtor's counsel.  According to the debtor, Ms. Richards also signed Sanford's name in the space for the debtor's signature.

January 18, 2005[9] Rule 2004 examination,[10] even though the court had denied his motion for a protective order before the scheduled examination.

Moreover, Sanford settled with Nortrax South, Inc. after appealing this court's January 31, 2005 decision. The terms of the alleged agreement are not in the record, and in any case the debtor did not obtain court approval for the settlement. *See* Fed. R. Bankr. P. 9019(a).

Sanford also testified at the confirmation hearing that he was living on money that his parents gave him on an "as needed" basis. He testified that despite learning that he was not permitted to accept loans from his family and friends during the bankruptcy, he continued to accept money – albeit now characterized by him as "gifts."

The debtor's post-petition borrowing without court approval violates 11 U.S.C. §364. It also is inconsistent with his role as a chapter 13 debtor, regardless of his subsequent characterization of the loans as gifts.[11]

Finally, Sanford has been indifferent to his duty to make full and accurate disclosure in his schedules and other filings. For example, the debtor's response to item 10 on the statement of financial affairs regarding prepetition cattle sales is essentially useless.[12] Moreover, at different times the debtor has suggested widely disparate values for his gun collection. Sanford also failed to schedule his ownership interests in several entities, deciding for himself to omit interests he had concluded were worthless. Despite

---

[9] January 14, 2005 Order Granting Motion for Examination Pursuant to Bankruptcy Rule 2004 (Guaranty Bank Exhibit D).

[10] Proces Verbal, January 18, 2004 [sic] (Guaranty Bank Exhibit E).

[11] Additionally, his financial relationship with his father casts doubt on the impartiality of the debtor's assessment of the lack of merit in a claim against his father for unjust enrichment in connection with the option to acquire property for real estate development described above.

[12] Sanford's Amended Statement of Financial Affairs (Guaranty Bank Exhibit L).

the trustee's requests for amendments, Sanford did not provide accurate information about his financial affairs.

This evidence demonstrates that Sanford has approached the prosecution of his bankruptcy in an extremely casual way. The debtor's behavior throughout this proceeding, from commencement until the confirmation hearing, signals Sanford's disregard for nearly every formality required of a debtor, as well as his indifference to the court's orders. Accordingly, Sanford has not proven the good faith necessary to maintain a chapter 13 bankruptcy and to confirm a plan.

## Feasibility

Guaranty also argues that Sanford's plan is not feasible, because the debtor has no regular income and has no ability to earn a regular income.

A debtor must be able to make all payments under the plan and to comply with the plan. 11 U.S.C. §1325(a)(6). The debtor, as plan proponent, must prove that the plan is feasible. *In re Keach*, 225 B.R. 264, 269 (Bankr. D. R.I. 1998).

Feasibility is a factual determination, and requires a finding that the debtor has or will have the necessary resources to satisfy the requirements of a confirmed plan. *First National Bank of Boston v. Fantasia*, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997). The court must weigh the debtor's resources against the payments required by the plan, to determine whether the plan if feasible, or a debtor's wishful thinking. *Fayette Bank v. Nesser (In re Joseph M. Nesser)*, 206 B.R. 357 (Bankr. W.D. Pa. 1997).

The evidence undermines the credibility of the debtor's claims regarding his anticipated income. Sanford projected monthly income of more than $6000, even though he admitted to the trustee at the meeting of creditors and to counsel for Guaranty in a

8

later Rule 2004 examination that he had no current income.  He confirmed that this remained the case at the May 24, 2005 confirmation hearing.

Sanford further admitted that his real estate development deal had fallen through,[13] and conceded that any hope of reviving it was purely speculative.  Indeed, the debtor testified at the confirmation hearing that the real estate development project was "dead" for several reasons, including his arrest.[14]

Sanford testified that his plan relies on income from a dirt hauling business he still has not established.  The evidence supports a finding that the debtor's projected income from that enterprise is speculative.  At the confirmation hearing Sanford confirmed that he had no contracts to haul dirt, he had never earned any income from dirt hauling, and that he had not even found a source of money to finance a bulldozer, essential to the dirt hauling business.

In the final analysis, Sanford's only fairly regular source of income is his parents, who provide him with cash on an "as needed" basis.  He admitted borrowing over $10,000.00 from parents and other family in the time leading up to his confirmation hearing in order to pay expenses such as cell phone and electricity bills.  Given that his monthly living expenses during the same period were $4,500.00,[15] the debtor lacks sufficient income to pay living expenses and plan payments of approximately $2000.  The plan is not feasible.

---

[13]  Transcript of March 4, 2005 Examination of Christopher Sanford (Guaranty Bank Exhibit G).

[14]  The court's January 31, 2005 memorandum opinion details the facts leading up to the debtor's arrest.

[15]  Sanford's Amended Summary of Schedules (Guaranty Bank Exhibit M).

## CONCLUSION

Christopher Sanford filed and prosecuted his chapter 13 bankruptcy without the good faith necessary to confirm a plan.  Additionally, the evidence demonstrates that Sanford lacks a regular source of income necessary to make the chapter 13 plan payments.  The debtor's optimism notwithstanding, his creditors are not required to rely on his unfounded plans for future enterprises.

Sanford's Second Amended Chapter 13 Plan is not feasible and therefore not confirmable.  On the court's motion, this case will be converted to a chapter 7 liquidation.

Baton Rouge, Louisiana, August 24, 2005.

<u>**s/ Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE